IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF/RESPONDENT

v.                        Civil No. 04-5160
                          Criminal No. 01-50037-001

RAYMOND RUFINO MONTEZ                                       DEFENDANT/MOVANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Raymond Rufino Montez filed a pro se motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence. The United States filed a response, requesting dismissal of the petition as barred by limitations. Montez completed a questionnaire (Doc. 54) as his response to the motion to dismiss. On review of the questionnaire, I scheduled an evidentiary hearing for November 15, 2005, on the statute of limitations issue and also on the merits of Montez's claim and appointed Montez an attorney. Hearing witnesses were Montez, Charles Stutte, David McElyea, Phillip Guinn, and Denny Halfacre. The parties filed post-hearing briefs. (Docs. 68, 69, 70-1).

DISCUSSION

In 2001, Montez was charged in a four-count indictment with distribution of methamphetamine. According to Dennis Halfacre, then a Washington County, Arkansas, deputy and member of a DEA drug task force team, the charges resulted from four controlled drug sales by Montez to confidential informant David McElyea who wore a wireless transmitter. After Montez

was arrested, a search of his home in West Siloam Springs, Oklahoma, yielded methamphetamine and cocaine.

Montez was originally represented by a federal public defender. Then, in December 2001, Montez hired attorney Charles Stutte and, on December 18, 2001, Montez signed a plea agreement. (Govt's Ex. 6). In January 2002, Montez pled guilty to Count IV of the indictment.

The plea agreement (Govt's Ex. 6) set out the maximum penalty of 40 years in prison and the mandatory minimum of 5 years. Montez agreed to cooperate with the government in investigating others and to appear before the grand jury or at trial if requested by the government. The government agreed that it would move to dismiss the remaining counts at sentencing and would bring no other federal charges stemming from activities in the indictment. The agreement stated that the guidelines applied to sentencing and that "relevant conduct," including conduct for which Montez has not been charged and conduct which was the basis for dismissed counts, would be considered. The government agreed not to object to a decrease for acceptance of responsibility and to advise the probation office and the court of the nature and extent of Montez's cooperation. Further, if warranted, the government would move for a downward departure based on the defendant's cooperation.

At the plea hearing (Govt's Ex. 8), the court explained that Montez could be sentenced up to 40 years in prison had he given a mandatory minimum prison term of at least 5 years. Stutte advised the judge he had read the plea agreement, discussed it with Montez, and felt like he thoroughly understood it.

The presentence investigation report (PSI) arrived at a base offense level of 32. Drug amounts considered in arriving at the base offense level included the methamphetamine involved

in the four controlled buys (311.9 grams), seized under the Oklahoma warrant (239.9 grams), sold to a third person (2 grams), and taken from Montez on arrest (.74 grams) for a total of 554.54 grams of methamphetamine. Three points were subtracted for acceptance of responsibility for an adjusted offense level of 29. With a criminal history category of III, the guideline imprisonment range was 108 to 135 months.

At sentencing, the government did not recommend a downward departure for substantial assistance under U.S.S.G. 5K1.1 but the prosecutor advised that if Montez provided such assistance in the future, the government could pursue a motion to reduce sentence under Fed. R. Crim. P. 35. Judge Dawson sentenced Montez to 108 months, five years supervised release, $15,000 fine, and $100 special assessment.

On appeal, Stutte filed a brief under *Anders v. California*, 386 U.S. 738 (1967), stating he was unaware of any nonfrivolous issues. He raised claims that the district court erred in making its drug quantity determination and in refusing to grant a downward departure. On March 5, 2003, the Eighth Circuit affirmed in an unpublished opinion. *United States v. Montez*, 56 Fed. Appx. 750, 2003 WL 873987 (8th Cir. 2003). The Eighth Circuit found that the district court did not plainly err by considering, as contemplated by the plea agreement, drug quantities from Montez's relevant conduct when determining the base offense level and the court's discretionary refusal to depart downward was unreviewable on appeal. The Eighth Circuit's mandate issued on March 31, 2003. Montez did not file for a petition of certiorari with the United States Supreme Court.

On June 29, 2004, Montez placed the instant motion in the mail. Under the prison mailbox rule, the motion was deemed filed on that date. *See Garrett v. United States*, 195 F.3d 1032, 1033 (8th Cir. 1999). Montez asserts claims that attorney Stutte labored under a conflict of interest because

he also represented the confidential informant David McElyea. Montez also claims that Stutte provided ineffective assistance when he failed to move to suppress evidence on the ground the search warrant issued out of the wrong federal district court in Oklahoma and failed to contest drug quantities used in sentencing as "relevant conduct." Montez finally claims that his sentence violated *Blakely v. Washington*, ___U.S. ___, 124 S.Ct. 2531 (2004).

*Statute of Limitations*

The United States contends Montez's motion is untimely. Section 2255 provides that a motion must be filed within one year of the date of the latest of --

(1) the date on which the judgment of conviction becomes final;

(2) the date on which an impediment to making a motion created by government action in violation of the Constitution or other federal law is removed;

(3) the date on which the right asserted was recognized by the Supreme Court and made retroactive to cases on collateral review; or

(4) the date on which the facts supporting the claim could have been discovered through the exercise of due diligence.

The United States contends the one-year period for filing the habeas motion commenced on the date on which the judgment of conviction became final. The government relies on *Clay v. United States*, 537 U.S. 522, 527 (2003), in which the Supreme Court held that for a defendant who does not file a petition for a writ of certiorari, the judgment of conviction becomes final when the time for filing a certiorari petition with the United States Supreme Court expires. Under Supreme Court Rules, the time to file a petition for writ of certiorari is 90 days after the date of entry of the judgment

appealed from. Rule 13(1). The time does not run from the date of mandate. Rule 13(3); *Clay*, 537 U.S. at 527, 529. A § 2255 petitioner therefore has one year and 90 days from the judgment of conviction within which to file a § 2255 motion.

Applying *Clay* to this case, the Eighth Circuit's opinion issued on March 5, 2003. Montez had until June 4, 2003, to file a certiorari petition which is the day the judgment of conviction became final. Montez therefore had until June 4, 2004, to file the instant motion but did not do so until June 29, 2004.

Montez responds that the *Clay* decision came after his conviction and should not be applied to him (the decision issued the day before the Eighth Circuit affirmed Montez's conviction/sentence). He argues that the one-year period of limitations should commence on the 90th day after the appellate mandate.

Montez's argument is unavailing. Prior to *Clay,* the circuits were divided over whether the one-year period was triggered for prisoners who do not seek certiorari by the issuance of the appellate mandate or the expiration of the time for seeking certiorari, with the majority of the courts holding the latter view. *See Clay* at 526 and n. 1.[1] It was not the law in any court before *Clay* that the time began 90 days after issuance of the appellate mandate. Accepting the triggering date for the statute of limitations as the date on which Montez's conviction became final, Montez's motion here was due no later than June 4, 2004, but was filed beyond this time.

Montez argues for a different triggering date, *i.e.,* the date on which he could have learned the facts supporting the conflict of interest claim through the exercise of reasonable diligence. *See Walker v. Crosby*, 341 F.3d 1240 (8th Cir. 2003) (timeliness of petition determined from latest

---

1. The Eighth Circuit had not ruled on the issue.

applicable limitations date). Montez's conflict-of-interest claim is that Stutte represented both him and the confidential informant David McElyea and failed to disclose the information. Montez maintains he did not discover this conflict claim until July 2003 and, thus, his petition filed in June 2004 was within the applicable one-year period.

At the evidentiary hearing, Montez testified that around July 5, 2003, he made a telephone call from prison to his friend Phil Guinn who read him a newspaper article concerning Stutte's representation of McElyea on a recent robbery charge. Guinn sent him the newspaper article with a birthday card a few days later. Montez was very surprised that Stutte represented McElyea and felt betrayed. Montez later showed the article to inmate Scotty Maglothin, an attorney formerly associated with Stutte who had represented McElyea. Maglothin said that Stutte had been McElyea's attorney for a while and had even assisted him in cases involving McElyea. Maglothin thought it was a joke but Montez was very upset and realized that Stutte had no loyalty to him. Montez continued that it was only from the pleadings in this case that he discovered that while representing him Stutte also represented McElyea in a bankruptcy case. Stutte did not tell him about the representation and he would not have hired Stutte if so advised.

Guinn testified that he obtained the newspaper article shortly after it came out on April 30, 2003, but did not advise Montez of it until sometime in June when Montez called him from prison. When he read the article to Montez, Montez was shocked and became upset. Guinn stated at one point, "I think he said he'd been thinking that Stutte was representing McElyea before him to start with." (Hearing T. 74-75). Guinn later refuted this testimony and offered that Montez told him he first became suspicious that Stutte had earlier represented McElyea when talking to inmates in the Texarkana prison. (However, Montez testified the conversations with inmate Maglothin at the prison

occurred after he spoke with Guinn.) Guinn continued that he sent the newspaper article to Montez along with a birthday card in early July 2003. After receiving the article, Montez asked Guinn to go to the county courthouse to find out if Stutte had represented McElyea prior to representing him but Guinn told him he did not know how.

Stutte testified that prior to being hired by Montez, he had known him for years and saw him on occasions with his former law partner, Scotty Maglothin. Stutte recalled that during the initial meeting on this case, Montez told him that McElyea was the confidential informant. Stutte did not know McElyea was working with government officers and was surprised by the information. Stutte then advised Montez he was representing McElyea in a bankruptcy proceeding and was awaiting the final discharge. Montez had no objections. Stutte further testified that he did not represent McElyea before the bankruptcy proceedings but, after Montez's case was completed, he represented McElyea on a DWI charge and the later 2003 robbery charge. Stutte added that he practiced law with Maglothin from 1987 to 1991 but did not actively participate in his criminal defense cases.

Denny Halfacre worked 27 years in law enforcement and was the case agent on Montez's case. Halfacre recalled that on one occasion confidential informant McElyea told him he had heard that Stutte was representing Montez and he was concerned because he considered Stutte his attorney. Halfacre told him that Montez was still represented by a public defender at that point and not to talk with Stutte until the situation got sorted out.

Halfacre continued that in December 2001 he interviewed Montez after Stutte became the attorney of record. Stutte had called the prosecutor asking for a meeting to discuss Montez's cooperating with the government. The meeting, which took place at the jail with Montez, Stutte, Halfacre, and drug task force member Gary Crews, did not go well. The officers wanted Montez to

provide information about individuals they knew in northwest Arkansas while Montez only wanted to talk about persons in California that the officers did not know or care about. Although Stutte tried to keep everyone calm, the discussion became heated and tempers flared. Halfacre said to Montez at one point, "Look, you know, you – obviously you've told me before you think McElyea is an informant on this case. You and McElyea don't need to have the same attorney. Why don't you just fire Mr. Stutte and let's take this thing to court." (Hearing T. 129). Halfacre said he made the statement because the representation by Stutte of both Montez and McElyea bothered him. Montez's response was that his family had not done well in court and he wanted to work something out and not go to trial but the officers were being unreasonable.

McElyea testified he learned after his bankruptcy proceeding was concluded that Stutte represented Montez at the same time in a criminal matter. He did not recall how he learned this and agreed that Stutte may have told him.

Based on the matters presented, I reject the triggering date urged by Montez of July 2003. I find, contrary to Montez's assertions, that prior to entering his guilty plea Montez was aware that Stutte represented McElyea in some legal matter unrelated to the criminal proceeding. Halfacre provided credible testimony that in December 2001 he advised Montez to go to trial and hire another attorney since Stutte also represented McElyea in another case. Halfacre's testimony was consistent with Stutte's assertion that he advised Montez of the representation of McElyea. Also, Guinn's testimony suggests that early on Montez knew or had strong suspicions that Stutte represented McElyea in a legal matter.

I conclude, as argued by the United States, that the triggering date for the statute of limitations was the date on which Montez's conviction became final. Accordingly, Montez's motion here, filed over a year after that date, is untimely.

A time-barred § 2255 motion may still be considered under the doctrine of equitable tolling. Equitable tolling is properly applied only when extraordinary circumstances beyond a prisoner's control make it impossible for him to file a petition on time or the conduct of the defendant lulled him into inaction. *United States v. McIntosh*, 332 F.3d 550, 551 (8th Cir. 2003)(citing *Jihad v. Hvass*, 267 F.3d 803, 805-06 (8th Cir. 2001)). Further, "[e]quitable tolling should only apply where the petitioner or movant has demonstrated diligence in pursuing the matter." *U.S. v. Martin*, 408 F.3d 1089, 1095 (8th Cir. 2005)(citation omitted)

Attorney error does not normally constitute extraordinary circumstances unless the error is so outrageous or incompetent as to render it extraordinary. *See id.* at 1093 (quoting *Baldayaque v. United States*, 338 F.3d 145, 152 (2nd Cir. 2003). Further, lack of legal knowledge by an unrepresented petitioner does not support equitable tolling. *United States v. McIntosh*, 332 F.3d at 551 (citing *Cross-Bey v. Gammon*, 322 F.3d 1012, 1015-16 (8th Cir. 2003)).

Montez relates that after his sentencing, he asked Stutte to appeal the court's calculation of drug quantities and Stutte became upset with him. Montez then left for prison and never again spoke to or corresponded with Stutte. Montez was unaware that Stutte had taken an appeal to the Eighth Circuit until late summer 2003 when a friend sent him a newspaper article about the Eighth Circuit's affirmance. Then, after reading the Supreme Court's decision in *Blakely v. Washington*, he began to "find out what was going on with my case and to see if it could help me in any way." At this time, he found out about the one-year statute of limitations. He contacted an attorney/friend to help

acquire his paperwork from Stutte and finally received copies of the file in late August 2003 and for the first time read the appeal brief. (Montez's Affidavit, Doc. 29).

At the evidentiary hearing, Montez admitted that he waited until July 2004 to file the instant motion because that was when the Supreme Court announced *Blakely v. Washington* and he had "a reason to fight it." (Hearing T. at 115). *Blakely v. Washington*, ___U.S. ___, 124 S.Ct. 2531 (2004), was announced on June 24, a few days before Montez prepared the instant motion. When asked what the *Blakely* decision had to do with his case, Montez responded in part that the case involved "relevant conduct and the facts had to be found by a jury." (Hearing T. at 116).

Here, Montez has not shown he was diligent in pursing the instant motion. Montez knew he had directed Stutte to file an appeal. The appellate decision issued in early March 2003 and, according to Montez, was reported in the newspaper although he did not get a copy until late summer 2003. However, during the time when the appeal was pending and announced, Montez had mail and telephone privileges and communicated with friends. Despite this, he never contacted Stutte or any court officials regarding the status of the requested appeal nor did he direct friends to do so. Montez also states he lacked knowledge of the statute of limitations until shortly before filing this action but lack of legal knowledge will not support equitable tolling of the statute of limitations. Montez has not shown that circumstances beyond his control made it impossible for him to present his claims here in a timely fashion.

*Claims*

Even though I have found Montez's claims barred by limitations, I will alternately address them on the merits. As discussed below, the claims do not afford a basis for relief.

*Conflict of Interest*

Stutte, who has been an attorney since 1983, denied at the evidentiary hearing that he labored under a conflict of interest while representing Montez. He explained that he represented McElyea in two bankruptcies, the last one filed on August 22, 2001. The discharge was signed on November 22, 2001, but the proceeding stayed on the docket until the filing of a belated "statement of intent." The final discharge was on January 12, 2002. He also represented McElyea on a later DWI charge and then again on the 2003 robbery charge.

Stutte recalled that Montez first contacted him on November 7, 2001, and he became the attorney of record around December 13, 2001. Prior to that time, Montez was represented by the federal public defender. When Montez told him at the initial interview that McElyea was the confidential informant, Stutte advised he represented McElyea in a bankruptcy case. Montez voiced no concern.

Stutte said that because he perceived no conflict of interest from his representation of both Montez and McElyea, he did not discuss the matter with Montez. From the beginning, Montez did not want to go to trial. He knew he was "caught" and wanted to cooperate and get the best deal possible. Stutte agreed that a plea arrangement was the best course for Montez. The government's case was very strong, consisting of four controlled buys of drugs that were taped. Thus, there was never a plan for a trial at which he would cross-examine McElyea and, in any event, McElyea's and Montez's versions of events were the same. Montez never denied his involvement in the sale of drugs and there was no angle involving McElyea that would help Montez. Therefore, his representation of McElyea had no impact on his representation of Montez.

Stutte added that had Montez decided go to trial, he would have "hammered" McElyea. He was not McElyea's lawyer "for life" and his loyalty is to whomever is seated at the table with him and "[a]ll other witnesses be dammed." (Hearing T. 31). However, by going to trial, Montez would have lost the important adjustment for acceptance of responsibility under the guidelines and the chance for a downward departure based on cooperation.

Stutte admitted that while representing Montez he asked McElyea to come to his office when they bumped into each other at the post office. Stutte said it was to satisfy his curiosity about why McElyea became a government informant and to get McElyea's version of events. McElyea told him he had been directed not talk to him and Stutte did not follow up on it. Stutte admitted he was trying to "walk a tight rope" in attempting discussions with McElyea. (Hearing T. At 23).

Montez testified he told Stutte from the beginning that he wanted to cooperate and get the lowest sentence. He does not deny that he sold drugs to McElyea on four occasions between September and November 2001. He described McElyea as a friend and said he met him in 1989 or 1990.

To prevail on a claim that Stutte labored under a conflict of interest, Montez must show that the attorney labored under an actual conflict of interest that adversely affected his performance. *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980); *Mickens v. Taylor*, 435 U.S. 162 n. 5 ( 2002); *Covey v. U.S.*, 377 F.3d 903 (8th Cir. 2004).

Certainly, an attorney who represents a defendant in a criminal case at the same time he represents the confidential informant in another legal matter is "walking a tight rope." Potential ethical problems and possible conflicting interests are present. Here, however, Montez has not shown that Stutte labored under an actual conflict of interest that adversely affected his performance.

Montez was caught in drug activity to which he had no defense. The drug buys were controlled and taped. From the beginning, Montez did not deny his wrongdoing and his and McElyea's version of events did not vary. Montez wanted to cooperate and plead guilty and there were no serious discussions of a trial. When Halfacre advised Montez to go to trial and get a new trial lawyer since Stutte also represented McElyea, Montez responded that he was uninterested in trial. Montez has not shown that Stutte did something or failed to do something due to conflicting interests between Montez and McElyea.

*Motion to Suppress/Drug Amounts*

Drug amounts from the three dismissed charges of the indictment and also from the drugs seized under the Oklahoma warrant were considered "relevant conduct" under U.S.S.G. § 1B1.3 to arrive at the base offense level of 32 based on a total of 554.54 grams of methamphetamine. Montez claims that Stutte should have filed a motion to suppress the Oklahoma drugs and should have objected at sentencing to the use of drug amounts as relevant conduct other than the count of conviction.

Montez testified at the evidentiary hearing that he told Stutte to challenge the Oklahoma search warrant and he said he would do so. Also, Stutte never explained relevant conduct to him until he received the PSI report. At that time, Montez reminded Stutte that he had told him that all other counts would be dropped. Montez admits that the plea agreement, which he read, mentions relevant conduct but Montez maintains he did not grasp the concept at the time. He recalled that when he learned that the drug amounts related to the Oklahoma warrant were included in the PSI report, Stutte told him it would anger the government to challenge the amounts.

Montez also offered that due to a "different culture" in the United States, he has a "language barrier" and thought when he entered his plea that he would only get 60 months when the judge advised that this was the mandatory minimum. (Hearing T. at 96). Montez admitted he is a United States citizen who was born here and has lived here many years.

Stutte testified that the only objection to the Oklahoma warrant was that it erroneously issued out of the Northern District of Oklahoma instead of the Eastern District of Oklahoma which he labeled a "technicality." He said this was first brought up by an Oklahoma lawyer who had conferred with Montez. Stutte offered that he likely would have filed a motion to suppress if Montez had been prosecuted in Oklahoma.

Stutte opined that he had no viable argument for excluding the Oklahoma drugs amounts from being considered relevant conduct unless Montez took the stand to say the drugs did not belong to him. Since Montez had already admitted the drugs belonged to him, Stutte would have been suborning perjury. Further, the prosecutor would not have entered a plea agreement knowing that Montez intended to contest the Oklahoma drug amounts. The prosecutor made clear that the agreement was contingent on Montez's acceptance of responsibility for all drug amounts involved and his promised cooperation. Stutte recalled telling Montez that there was a slim likelihood of excluding the Oklahoma drug amounts as relevant conduct and that pursuing the motion could jeopardize the plea agreement and credit for acceptance of responsibility. Stutte recalled a case in which a client had "split hairs" on drug amounts and was denied acceptance of responsibility. Stutte added that Montez was also hoping for a downward departure based on cooperation down to the mandatory minimum of 60 months in prison. In the end, Montez did not obtain a downward departure for cooperation because the authorities were not impressed with the information he offered.

-14-

Stutte further testified that he specifically advised Montez that although he would be convicted of only one of the four charges against him, other drug amounts would be considered relevant conduct. Stutte said they discussed the matter when the plea agreement was entered and had an in-depth conversation about it when the PSI report came out.

Denny Halfacre testified it was his understanding that part of Montez's property in Siloam Springs, Oklahoma, was in the Northern District of Oklahoma and part was in the Eastern District of Oklahoma. He explained the house is one-fourth mile from the boundary line and the officers innocently went to the wrong district court for the warrant.

To prevail on an ineffective assistance of counsel claim, Montez must show that counsel's performance was deficient and that, as a result, he suffered prejudice, *i.e.,* but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Lockhart v. Fretwell*, 506 U.S. 364 (1993); *Strickland v. Washington*, 466 U.S. 687 (1984). Strategic choices made after reasonable investigation are generally upheld. *See Strickland v. Washington*, 466 U.S. at 690-691.

Here, although Montez states he wanted to file a motion to suppress the evidence seized in Oklahoma, he was not charged in Oklahoma and this court was not the jurisdiction with authority over the warrant. *See* Fed. R. Crim. Pro. 41. In any event, even if Stutte had filed a motion to suppress in Oklahoma, it does not appear it would have been successful. Stutte labeled the problem with the warrant a technicality and Halfacre said the officers made a innocent mistake in the matter, suggesting that the warrant would have been upheld based on the "good faith" beliefs of the officers involved. *See United States v. Leon*, 468 U.S. 897 (1984).

Regarding the matter of relevant conduct, it appears that Stutte and Montez were somewhat surprised by the inclusion of some of the drug amounts in the PSI report as relevant conduct. As Stutte admitted, it was after the PSI report issued that the two had an in-depth conversation concerning "relevant conduct." However, Stutte perceived no way to successfully challenge the Oklahoma drug amounts and there was a downside to making a challenge – the potential loss of the reduction in the base offense level for acceptance of responsibility and the potential lost opportunity for Montez to provide useful information to the United States and perhaps receive a downward adjustment for cooperation. Here, there is no showing that any challenge to the drug amounts would have been successful and, moreover, Stutte's strategy was to have his client get all the benefits possible from acceptance of responsibility and cooperation. I find no defective performance or prejudice from Stutte's performance in the matter.

Finally, I reject as noncredible the testimony of Montez that he thought the maximum sentence was 60 months. The maximum and mandatory prison terms were set out in the plea agreement and gone over in depth at the plea hearing. Moreover, Montez makes no claim that his plea agreement was unknowing and involuntary.

*Blakely v. Washington*

Montez suggests in his § 2255 motion that Stutte should have foreseen *Blakely v. Washington* or should have preserved a *Blakely*-type argument for appeal in attacking sentence enhancements based on drug amounts. In *Blakely v. Washington*, ___U.S. ___, 124 S.Ct. 2531 (2004), the Supreme Court struck down as unconstitutional a Washington state sentencing scheme that allowed judges to apply sentencing enhancements based on judge-found facts. The Court held that the Sixth Amendment right to trial by jury required that any fact that leads to a sentencing enhancement, other

than the fact of a prior conviction, must be found by a jury or admitted by the defendant. In *United States v. Booker*, ___U.S. ___, 125 S.Ct. 738 (2005), the Court applied the *Blakely* holding to the Federal Sentencing Guidelines, finding them unconstitutional. The Court made the mandatory Guidelines advisory only to correct the defect.

*Blakely* and *Booker* were announced after Montez's conviction became final and they are not retroactively applied to convictions that became final prior to the decisions. *Never Misses a Shot v. United States*, 413 F.3d 781 (8th Cir. 2005). Further, Stutte did not provide ineffective assistance based on the law then in effect and he was not ineffective for failing to predict the cases.

CONCLUSION

Based on the above, I recommend the instant petition be denied and dismissed. **The parties have ten days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 23rd day of March 2006.

/s/Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE